**DOCTOR'S ASSOCIATES, INC. and Franchise World Headquarters, Inc., Plaintiffs–Appellants, Cross–Appellees,**

v.

**John M. WEIBLE, Defendant–Appellee, Cross–Appellant.**

**Nos. 1279, 1408, Dockets 95–7936, 95–7938.**

United States Court of Appeals, Second Circuit.

Argued April 18, 1996.

Decided Aug. 12, 1996.

Mark R. Kravitz, Wiggin & Dana, New Haven, CT, for Plaintiffs–Appellants, Cross–Appellees.

David Duree, Reinert & Duree, P.C., St. Louis, MO (Nicholas Wocl, Tooher, Puzzuoli & Wocl, Stamford, CT, of counsel), for Defendant–Appellee, Cross–Appellant.

Before MINER, McLAUGHLIN, and LEVAL, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Plaintiffs appeal from an order of the United States District Court for the District of Connecticut (Gerard L. Goettel, *Judge*), denying their motion for judgment notwithstanding the verdict after a jury found them liable for abuse of process under Connecticut law. Defendant cross-appeals from the district court's order reducing the jury's compensatory damages award to him on his counterclaim.

## BACKGROUND

Plaintiff Doctor's Associates, Inc. ("DAI") is the national franchisor of Subway sandwich shops. It is a Florida corporation with its principal place of business in Florida. The other plaintiff is Franchise World Headquarters, Inc. ("FWHI"), a corporation that provides administrative services to DAI and is located in Connecticut.

In 1988, Defendant John Weible bought a Subway franchise in California. As part of his purchase agreement, Weible entered into a standard franchise contract with DAI; and he also subleased his store premises from Subway Sandwich Shop, Inc. ("SSS"), one of DAI's affiliated leasing companies.

The franchise agreement contained one of DAI's standard arbitration clauses, calling for arbitration of "[a]ny controversy or claim arising out of or relating to this contract." The arbitration would take place "in Bridgeport, Connecticut, or whichever city in which [DAI] is then headquartered." Weible's sublease for the shop contained a "cross-default provision," which allowed the sublessor, SSS, to bring an eviction action against Weible if he breached the franchise agreement with DAI.

A dispute arose between DAI and Weible over his right to buy a second Subway franchise for a reduced franchise fee. Weible stopped paying royalties to DAI, allegedly under a clause in the franchise agreement permitting the franchisee to withhold payment in the event of default by DAI.

SSS, as lessor of the California shop, filed an eviction action against Weible in California state court. Weible appeared *pro se*, but then failed to file an answer; and a default judgment was entered against him in California.

Weible, still *pro se*, then sued DAI for more than $26 million in California state court, alleging numerous common law violations in connection with his franchise agreement. Pursuant to the arbitration clause in the franchise agreement, the California court stayed the action to allow the parties to arbitrate.

Weible then filed a demand for arbitration with the American Arbitration Association

against DAI, seeking $800,000 in compensatory damages and $30 million in punitive damages.

In January 1992, while Weible's California lawsuit and arbitration demand were pending, officials at DAI and FWHI detected that someone had gained unauthorized access to the voice mailboxes of Frederick Deluca, the President of DAI, and Leonard Axelrod, Vice–President and Chief In–House Counsel for DAI and FWHI. Their suspicions had been aroused when they learned that a ribald message, left by a co-worker on Axelrod's voice mailbox, had been transferred to the voice mailbox of another employee, and subsequently "shared" with other co-workers. Shaken by the security breach, the companies conducted an investigation, which led them to point the finger at Weible.

Axelrod allegedly threatened Weible that, unless he abandoned both his arbitration and his California lawsuit against DAI, DAI and FWHI would pursue claims against him for the voice mail "break-in." Weible refused to drop his claims.

DAI sought permission from the arbitrators to add a counterclaim against Weible in the pending arbitration, based on the alleged intrusions into its voice mail system. The arbitrators denied DAI's request, finding that the counterclaim was not covered by the arbitration clause in the franchise agreement.

In the meantime, DAI and FWHI filed a damage action against Weible, in the United States District Court for the District of Connecticut, alleging violations of the Oral Communications Act, 18 U.S.C. § 2510 *et seq.*, and the Stored Wire and Electronic Communications and Transactional Records Access Act, 18 U.S.C. § 2701 *et seq.* Weible counterclaimed for common law abuse of process under Connecticut law, claiming that Plaintiffs filed the federal suit solely to strongarm him into settling or dropping his arbitration demand and his California lawsuit.

DAI and FWHI moved to dismiss the counterclaim for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). They argued that because Weible's counterclaim stated that the abuse of process occurred upon the mere *filing* by Plaintiffs of

their complaint, the counterclaim was really a claim for malicious prosecution (or, as it is quaintly called in Connecticut, vexatious litigation) and, as such, that it lacked an essential element of that tort—namely termination of the lawsuit in Weible's favor.

The motion was referred to a magistrate judge (Joan Glazer Margolis, *Magistrate Judge*), who recommended that the motion to dismiss be denied. The district court (T.F. Gilroy Daly, *Judge*) endorsed that recommendation. The case was then transferred to another district judge (Gerard L. Goettel, *Judge*), and proceeded to trial.

In the midst of these federal proceedings, the arbitrators awarded Weible $219,900 on all his arbitration claims. DAI paid the award in full.

*The Trial*

*Plaintiffs' Voice Mail Claims*

DAI and FWHI introduced telephone records demonstrating that, during the seven months between July 1, 1991 and January 31, 1992, about 900 phone calls (aggregating about 124 hours) were made from Weible's home telephone to the toll-free number that, by use of confidential access codes, provides outside access to Plaintiffs' voice mail system. Weible had no business relationship with either DAI or FWHI during that seven-month period.

There was further evidence that, after Plaintiffs learned of the alleged security breach of their voice mail system, they changed the security codes for Axelrod's and DeLuca's voice mailboxes. In the twenty-four hours after the change, 105 calls were made from Weible's home telephone to the toll-free voice mail number. According to computer records, the majority of those calls corresponded to possible unsuccessful attempts to "hack" into the DeLuca and Axelrod mailboxes during the same period.

*Defendant's Abuse of Process Counterclaim*

At trial, Weible presented the following evidence on his counterclaim: (1) Axelrod conceded that DAI and FWHI pursued charges against Weible, but not against another employee who also had gained unau-

thorized access to the voice mail system, because Weible had filed a suit against DAI and the other employee had not; (2) before Plaintiffs filed this lawsuit, Axelrod allegedly threatened to bring an action against Weible unless he withdrew his claims against DAI; and (3) Plaintiffs sought to recover only a nominal sum from Weible in this action, but spent a much larger fortune pursuing their claims (suggesting that their motive was pure harassment).

*Pre–Verdict and Post–Verdict Motions*

At the close of all the evidence, Plaintiffs moved for a directed verdict on the counterclaim. *See* Fed.R.Civ.P. 50(a). The district court denied the motion, and submitted all the claims and the counterclaim to the jury.

The jury found for Weible on both Plaintiffs' voice mail claims and on Weible's counterclaim, and on the latter awarded him $95,000 in compensatory damages and $115,000 in punitive damages.

Plaintiffs moved for judgment notwithstanding the verdict on the counterclaim. *See* Fed.R.Civ.P. 50(b). In the alternative, they asked the court to reduce the damages award.

The court denied Plaintiffs' Rule 50(b) motion, but granted their alternative motion by reducing the compensatory damages from $95,000 to $56,556. *Doctor's Assocs. v. Weible*, No 3:92–CV–574 (GLG), slip op. at 2 (D.Conn. Aug. 8, 1995).

DAI and FWHI appeal, arguing that the court erred by failing to grant their motion for judgment *non obstante veredicto* ("judgment n.o.v.") on Weible's counterclaim. (They do not appeal the jury's verdict for Weible on their voice mail claims.) Weible cross-appeals, arguing that the district court should not have reduced the jury's compensatory damages award.

## DISCUSSION

The primary issue in this appeal is whether Weible presented sufficient evidence at trial to permit a rational jury to find in his favor on his abuse of process counterclaim. A careful review of the record compels us to conclude that Weible did not (and, in any event, could not) present evidence sufficient

to prevail on this claim under Connecticut law. Thus, we reverse the district court's denial of Plaintiffs' judgment n.o.v. motion, and remand with instructions to enter judgment for Plaintiffs on the counterclaim.

We begin with a procedural nicety. There are no more motions for a directed verdict or judgment n.o.v. Federal Rule of Civil Procedure 50 still "governs the procedure for removing a judgment from the verdict-winner by the use of either a motion for a directed verdict, Rule 50(a)[,] or a motion for judgment notwithstanding the verdict, Rule 50(b)." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir.1993). As of December 1, 1991, however, the hoary terms "judgment notwithstanding the verdict" and "directed verdict" were forsaken. *Id.* Now, both pre-verdict and post-verdict motions under Rule 50 are labelled motions for "judgment as a matter of law." *Id.*

Although the bottles have changed, the wine remains the same: the standard for granting or denying the motion is unaltered. *Id.; see* Fed.R.Civ.P. 50 advisory committee's note, 1991 amendment. Alas, still comfortable with the common law language, many courts and litigants—including the district court and the parties in this case—persist in using the terms "directed verdict" and "judgment notwithstanding the verdict" (or "judgment n.o.v."). For clarity, as well as consistency with the parties' submissions and the proceedings at trial, we will acquiesce in the parties' terminology for purposes of this opinion.

### I. *Standard of Review*

■ We review *de novo* a district court's denial of a judgment notwithstanding the verdict. *See Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1212–13 (2d Cir.1993); *Schwimmer v. Sony Corp. of Am.*, 677 F.2d 946, 951–52 (2d Cir.), *cert. denied*, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982).

### II. *Judgment Notwithstanding the Verdict*

■ "Judgment n.o.v. is proper 'only if the evidence viewed in the light most favorable to the non-movants, without considering credibility or weight, reasonably permits only

a conclusion in the movant's favor.'" *Baskin v. Hawley*, 807 F.2d 1120, 1129 (2d Cir.1986) (quoting *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir.), *cert. denied*, 459 U.S. 838, 908, 103 S.Ct. 86, 213, 74 L.Ed.2d 80, 170 (1982)); *see also Ebker v. Tan Jay Int'l, Ltd.*, 739 F.2d 812, 825 & n. 16 (2d Cir.1984); *Schwimmer*, 677 F.2d at 952. In other words, there must be either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guess-work, or the evidence must be "so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." *Baskin*, 807 F.2d at 1129; *see also Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 167–68 (2d Cir. 1980).

### A. *Specificity Requirement*

■ "[A] motion for j.n.o.v. is technically a renewal of a motion for a directed verdict." *Meriwether v. Coughlin*, 879 F.2d 1037, 1044 (2d Cir.1989). Thus, Federal Rule of Civil Procedure 50(b) generally proscribes judgment n.o.v. on any ground not specifically raised in an earlier motion for a directed verdict at the close of all the evidence. *See* Fed.R.Civ.P. 50(b); *Baskin*, 807 F.2d at 1129–30; *see also Samuels*, 992 F.2d at 14; *Meriwether*, 879 F.2d at 1044; *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988). The perfectly defensible rationale for this requirement is to "prevent[ ] a party who loses at trial from using a j.n.o.v. motion as a 'trap' after it is too late for the winner of the verdict to cure any alleged deficiencies of proof." *Meriwether*, 879 F.2d at 1044 (citations omitted); *see also Lambert v. Genesee Hosp.*, 10 F.3d 46, 54 (2d Cir.1993) ("the specificity requirement is obligatory and ensures that the other party is made aware of any deficiencies in proof that may have been overlooked"), *cert. denied*, —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *Smith*, 861 F.2d at 367 ("The purpose of the requirement of specificity is to give the claimant a fair 'opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'" (citation omitted)).

### (1) *Procedural Challenge*

■ Weible challenges the procedural sufficiency of Plaintiffs' directed verdict motion, contending that it was not specific enough to preserve their right to move for judgment n.o.v. on the grounds later raised before the district court and again on this appeal.

The relevant portions of Plaintiffs' motion for a directed verdict, made at the close of the evidence, on the abuse of process claim, are as follows:

PLAINTIFFS' COUNSEL: [W]e do intend [to] move for [a] directed verdict on the counterclaim....

\* \* \* \* \* \*

THE COURT: I think [Weible] would argue that even if you [Plaintiffs] prevail on your claim or one of your claims, that the jury could still award him damages on the counterclaim if they believe that although there is a basis for the plaintiff's claim they were probably brought for improper purposes.

\* \* \* \* \* \*

PLAINTIFFS' COUNSEL: I think that turns ... the law as we now have it, the practice of law on its head because, if, in fact, there's a good faith basis for bringing the claim, then if [Weible's counsel] is right, every time somebody is the defendant to a claim, which [is] an otherwise good faith [ ] cause of action, they are going to say, wait, a second, the real reason you are doing this is because I am your competitor in business and I am your neighbor and don't like you or [your] alleged intrinsic motive.

THE COURT: I don't think they can do that in this instance. The defendant has a claim against the plaintiff which was pending at the time the plaintiff instituted this lawsuit against the defendant.

PLAINTIFFS' COUNSEL: That is true, your Honor, but my other analogy is, and it happens all of the time, as we know, party A files a lawsuit, party B files a counterclaim, it may well be in some of those cases, party B not only has a good faith basis for bringing the cause of action, but ... also is hoping to get some sort of negotiating leverage or tactical

advantage with respect to party A's initial claim by bringing the counterclaim, and there is nothing—law is practiced that way all of the time everywhere in the United States, and I don't think [Weible's counsel] has any indications suggesting that is improper.

\*    \*    \*    \*    \*    \*

[I]f [Weible's counsel's] theory about this is correct, [and] I am not being facetious when I say this, ... I think the risk is you would have an infinite series of counterclaims for abus[e of] process. We could bring one against Mr. Weible for abus[e of] process.

THE COURT: That occurred to me you could assert a counterclaim in this case.

PLAINTIFFS' COUNSEL: Another thing is if I could borrow that [the Restatement (Second) of Torts] a minute—one who uses a legal process, whether criminal or civil against another primarily to accomplish a purpose for which it is not designed; goes on to talk about misuse of process in the comment here. But seeking to vindicate a legitimate legal right as established by federal statute and state statute is not a purpose for bringing the lawsuit; it is not designed—that is why they invented—

THE COURT: That is the issue for the jury, was it brought to recover damages for the defendant or was it brought to make him drop his claims against the plaintiff. That is for the jury. In any event, I deny the motion to dismiss and submit it to the jury.

To meet the specificity requirements of Rule 50(a), a directed verdict motion "shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed.R.Civ.P. 50(a)(2); *see also Samuels,* 992 F.2d at 15. Scrupulously read, it is difficult to discern an oasis of an idea in this sandstorm of words. What

was the precise ground of the motion? We see little other than a jeremiad about the dire consequences of letting the counterclaim stand. Muddying the waters, the district court cut short Plaintiffs' argument, hindering our ability to adequately assess the grounds for the directed verdict motion. *See Wilson Sporting Goods Co. v. David Geoffrey & Assocs.,* 904 F.2d 677, 683 (Fed.Cir.) (holding that "[i]t would be unfair" to deny a party the right to move for j.n.o.v. where "the court cut short counsel's [directed verdict motion], making clear its view that the issue presented a jury question and that it wanted to move on to consider the jury instructions"), *cert. denied,* 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990); *see also Miller v. Premier Corp.,* 608 F.2d 973, 979 n. 3 (4th Cir.1979) (holding that oral motion for "dismissal," made in a colloquy between the court and counsel, was "too confusing to permit confident assessment" that counsel failed to satisfy Rule 50(a)).[1]

### B. Manifest Injustice

But, even where Plaintiffs' motion is not sufficiently specific to satisfy us, Rule 50 does not necessarily tie our hands. Although the "specificity requirement is obligatory," *Lambert,* 10 F.3d at 54, we will not woodenly apply it merely to attain "an unwarranted triumph of form over substance," *Russo v. New York,* 672 F.2d 1014, 1022 (2d Cir.1982) (quoting *Oliveras v. American Export Isbrandtsen Lines, Inc.,* 431 F.2d 814, 817 (2d Cir.1970)), *modified on other grounds,* 721 F.2d 410 (2d Cir.1983). Thus, "relief from this [specificity] requirement is available where necessary to avoid ' "manifest injustice." ' " *Meriwether,* 879 F.2d at 1044 (quoting *Baskin,* 807 F.2d at 1130 (quoting *Sojak v. Hudson Waterways Corp.,* 590 F.2d 53, 54–55 (2d Cir.1978))); *see also Samuels,* 992 F.2d at 15.

Under the facts of this case, we find that such injustice would result were we not to

---

1. Significantly, the district court denied Plaintiffs' judgment n.o.v. motion, not on the basis that the earlier directed verdict motion lacked specificity, but rather on the ground that "[t]here was evidence in this case from which a reasonable jury could have found for defendant on his abuse of process claim, as charged." *Weible,* No 3:92–CV–574 (GLG), slip op. at 1. The court concluded that "[t]he real purpose of plaintiffs' motion is to *reargue* the issue of whether defendant should have been allowed to assert a counterclaim for abuse of process." *Id.* at 2 (emphasis added).

reach the question of whether Weible proved his abuse of process claim. Specifically, under Connecticut law *as· properly stated,* Weible did not (and could not) present evidence to sustain a verdict that Plaintiffs misused the legal process here.

### III. *Abuse of Process*

■ Under Connecticut law, the elements of a cause of action for abuse of process are as follows:

> An action for abuse of process lies against any person using "a legal process against another in an improper manner or to accomplish a purpose for which it was not designed." Because the tort arises out of the accomplishment of a result that could not be achieved by the proper and success- ·ful use of process, the Restatement Second (1977) of Torts, § 682, emphasizes that the gravamen of the action for abuse of process is the use of "a legal process ... against another *primarily* to accomplish a purpose for which it is not designed...." (Emphasis added.) Comment b to § 682 explains that the addition of "primarily" is meant to exclude liability "when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant."

*Mozzochi v. Beck,* 204 Conn. 490, 529 A.2d 171, 173 (1987) (citations omitted).

Thus, under Connecticut law, a party does not abuse the legal process merely by filing suit. This is true regardless of the plaintiff's motive. *See id.* at 173–74; *Varga v. Pareles,* 137 Conn. 663, 81 A.2d 112, 115 (1951) ("while an ulterior motive often is present, it is not an essential element of the action [for abuse of process]"). Rather, liability for abuse of process lies only when the offending party overtly misuses the process once the proceeding has begun. *See Mozzochi,* 529 A.2d at 174 (abuse of process claimant must "point to specific misconduct intended to cause specific injury outside of the normal contemplation of private litigation"); *Shaeffer v. O.K. Tool Co.,* 110 Conn. 528, 148 A. 330, 332 (1930) (abuse of process occurs "not in the issue of process, but in its abuse"); *Lewis Truck & Trailer, Inc. v. Jandreau,* 11

Conn.App. 168, 526 A.2d 532, 534 (1987) (" 'the gist of the tort [of abuse of process] is not commencing an action or causing process to issue without justification, but misusing, or misapplying [that] process' " (citation omitted)); *see also Lodges 743 & 1746 v. United Aircraft Corp.,* 534 F.2d 422, 465 (2d Cir. 1975) ("Abuse of process requires more than simply improper motive. There must also be some action taken to utilize the court's processes for collateral purposes not related to the suit in question ...."), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976); W. Page Keeton, *et al., Prosser and Keeton on the Law of Torts* § 121, at 898 (5th ed.1984) ("a wilful act in the use of the process not proper in the regular conduct of the proceeding" is one of "[t]he essential elements of abuse of process"). In short, no matter what misconduct by the tortfeasor occurs before the commencement of suit, it is not, in itself, an abuse of process because there is not yet process to abuse.

Examples of such overt misuse during the legal proceedings include: (i) using the pleadings as leverage to coerce the payment of a debt or surrendering of property unrelated to the litigation, *Mozzochi,* 529 A.2d at 172; (ii) using unreasonable force, excessive attachment or extortionate methods to enforce a right of action, *id.* at 172–73; or (iii) using the process to gain a collateral advantage extraneous to the merits, *id.* at 173, *e.g.,* improper use of a subpoena, *Lodges,* 534 F.2d at 465; *see also* Restatement of Torts Second (1977) § 682 cmt. b.

### A. *Court's Charge*

The district court gave the following instruction on Connecticut abuse of process law:

> Abuse of process occurs when a person uses a legal process against another in an improper manner or to accomplish a purpose for which it is not designed. If you find that the Plaintiffs *began the lawsuit* against Mr. Weible to coerce him into settling the action against Plaintiffs rather than primarily to bring him into account for what they believe to be his unauthorized use of their voice mail system, then

you will find for Mr. Weible [on his counterclaim].

(Emphasis added). Essentially this instruction advised the jury—erroneously—that it should find for Weible if it concluded that Plaintiffs filed the lawsuit with an improper motive. This is not the law of Connecticut.

Judge Goettel himself seemed uncomfortable with the charge he had given, for when it was assailed on the Rule 50 motion for judgment n.o.v., he remarked: "[t]he real purpose of plaintiffs' motion is to reargue the issue of whether defendant should have been allowed to assert a counterclaim for abuse of process. However, this issue was settled [in Judge Daly's ruling on Plaintiffs' 12(b)(6) motion] before this case was transferred to the undersigned." *Doctor's Assocs. v. Weible,* No 3:92–CV–574 (GLG), slip op. at 2 (D.Conn. Aug. 8, 1995). Although the court stated that it had "doubts as to the correctness of the ruling [by Judge Daly]," it nonetheless held that that ruling was "clearly law of the case." *Id.* Thus, the court denied Plaintiffs' motion, finding that "[t]here was evidence in this case from which a reasonable jury could have found for defendant on his abuse of process claim, *as charged." Id.* at 1 (emphasis added).

In a similar vein, Weible now contends that this Court is constrained to apply the law of abuse of process *as instructed,* because Plaintiffs' failure to object to the jury instruction means they must now live with the legal theory as articulated by the court.

■ We disagree. As we stated in *Ebker v. Tan Jay International, Ltd.,* 739 F.2d 812 (2d Cir.1984), a party's failure to object to an erroneous jury instruction:

does not render the instruction the "law of the case" for purposes of appellate review of the entry of judgment n.o.v. *See* 9 Wright & Miller, [Federal Practice and Procedure: Civil] § 2558, at 670–71 ("Many decisions say that an instruction not objected to becomes the law of the case. This may be merely one way of phrasing the general principle that failure to object ordinarily bars later challenge to an instruction. It appears to have no meaning beyond that.") (footnotes omitted). Rather, we must review the district

judge's order [on a judgment n.o.v. motion] *in light of the "applicable law which is controlling, and not what the trial court announces the law to be in [its] instructions."*

*Id.* at 825–26 n. 17 (emphasis added) (quoting *Coca Cola Bottling Co. v. Hubbard,* 203 F.2d 859, 862 (8th Cir.1953)).

The Supreme Court, in *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), endorsed these precepts:

If the evidence presented in the first trial would not suffice, as a matter of law, to support a jury verdict *under the properly formulated defense,* judgment could properly be entered for the respondent at once, without a new trial. And that is so even though (as petitioner claims) respondent failed to object to jury instructions that expressed the defense differently, and in a fashion that would support a verdict.

*Id.* at 513–14, 108 S.Ct. at 2519 (emphasis added) (citing *Ebker,* 739 F.2d at 825–26 n. 17).

Thus, even though Plaintiffs failed to object to the court's instruction on abuse of process, we, nonetheless, will apply the law as correctly formulated, not as the district court erroneously framed it.

### B. *Application of Law, Correctly Formulated, to Facts*

■ In his counterclaim, Weible asserted that Plaintiffs were liable for abuse of process because they filed suit against him with a vengeful motive. To quote the counterclaim:

The Complaint . . . was filed not for the purpose of resolving the [voice mail] claims . . . but instead, was filed for the ulterior purpose of coercing . . . Weible, to settle his complaint pending in California and his arbitration demand, . . . for less than the true and fair value of those claims, and therefore filing the Complaint constitutes an abuse of process

. . . .

His counterclaim, however, alleges no particular act of misconduct during the proceedings themselves.

During trial, Weible presented the following proof on his counterclaim: (1) that Plaintiffs had pursued charges against Weible, but not against another employee who had also broken into their voice mail system; (2) that before they actually filed this suit, Plaintiffs allegedly threatened to bring the action unless Weible withdrew his state and arbitration claims against DAI; and (3) that Plaintiffs knew Weible was not wealthy and would unlikely be able to pay a judgment against him.

At best, this evidence reveals that Plaintiffs manifested a spiteful motive *prior* to the institution of this action. But that is simply not enough. Without evidence demonstrating that Plaintiffs misused the legal process *during* the course of litigation, Weible cannot state a claim for abuse of process. *See Lodges,* 534 F.2d at 465 ("Abuse of process requires more than simply improper motive. There must also be some action taken to utilize the court's processes for collateral purposes not related to the suit in question . . . ." (footnote omitted)).

■ The "collateral purpose" Weible cites for this present civil suit—to coerce him into settling his arbitration and state law claims—is tenuous at best. The suggested purpose is not necessarily inappropriate. *See, e.g., Sussman v. Bank of Israel,* 56 F.3d 450, 459 (2d Cir.) ("prelitigation letters airing grievances and threatening litigation if they are not resolved are commonplace, sometimes with salutary results, and do not suffice to show an improper purpose if nonfrivolous litigation is eventually commenced"), *cert. denied,* —— U.S. ——, 116 S.Ct. 305, 133 L.Ed.2d 210 (1995). Moreover, after Plaintiffs filed suit in December 1992, they did not solicit or engage in any settlement negotiations with Weible. Indeed, Weible prevailed on his arbitration claims in August 1993, and Plaintiffs paid the award in full. Thus, Plaintiffs no longer had the incentive suggested by Weible to pursue the federal action to its conclusion in 1995.

Returning to his Rule 50 specificity argument, Weible contends that, had Plaintiffs

"raised their current contentions that the tort of abuse of process required additional misconduct during the prosecution of the case itself," he would have been able to produce evidence demonstrating such misconduct during these proceedings. Weible claims, for instance, that he would have shown that Plaintiffs provided information, obtained during discovery in their civil case, to the Federal Bureau of Investigation and the United States Attorney's Office in an effort to persuade them to file criminal charges against him.

Weible cites absolutely no authority for the proposition that a civil litigant becomes liable for the tort of abuse of process when it furnishes the government with information uncovered during discovery in a related civil proceeding; and we likewise have found none. While it may be "improper for the Government to institute a civil action to generate discovery for a criminal case," *United States v. Tison,* 780 F.2d 1569, 1573 (11th Cir.1986), that rule exists to prevent the government from "avail[ing] itself of [the more liberal] civil discovery devices to obtain evidence for subsequent criminal prosecution." *United States v. Parrott,* 248 F.Supp. 196, 202 (D.D.C.1965).

There is no allegation that Plaintiffs procured information at the request of the government, or that they gained some collateral advantage merely by giving information to the government. It is within the *prosecutor's* discretion whether or not to institute criminal proceedings. *See Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985) (" 'the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion' ") (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978)). In any event, the government never filed criminal charges against Weible in this case. We simply cannot agree that merely providing information to the government, without more, constitutes abuse of the legal process.

We therefore conclude that, viewing the evidence in the light most favorable to Wei-

ble, no jury could reasonably find that he presented sufficient evidence to prevail on his abuse of process claim. Accordingly, we reverse the district court's denial of Plaintiffs' judgment n.o.v. motion, and remand with instructions to enter judgment for Plaintiffs on the counterclaim.

## IV. *Cross-appeal*

Weible cross-appeals, arguing that the court incorrectly reduced the amount of the jury's compensatory damages award. Because we reverse the jury award on the counterclaim and order that Plaintiffs' judgment n.o.v. be granted, we dismiss Defendant's cross-appeal as moot.

## CONCLUSION

We have reviewed all other claims advanced on this appeal and find them unavailing. The decision of the district court is REVERSED and REMANDED with instructions to enter judgment for Plaintiffs. Defendant's cross-appeal is DISMISSED as moot.